# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

ALBUQUERQUE TECHNICAL
VOCATIONAL INSTITUTE,

       Plaintiff,

vs.                                       CIVIL NO. 97-710 RLP/WWD

GENERAL METERS CORPORATION,

       Defendant.

## FINDINGS OF FACT AND CONCLUSIONS LAW

THIS MATTER having come before the Court for trial from May 3, 1999 through May 10, 1999, the Court having tried the case upon the facts without a jury, hereby makes its findings of fact and conclusions of law pursuant to Rule 52 Fed.R.Civ.P.

## FINDINGS OF FACT

1.      Plaintiff, Albuquerque Technical-Vocational Institute ("TVI"), is a public educational institution organized under the laws of the State of New Mexico.

2.      Defendant, General Meters Corporation ("GMC"), is a California corporation and, at all times material hereto, was engaged in the business of designing, manufacturing, selling, installing and supporting computerized systems and components to educational institutions for the operation and management of campus services offered to the institutions' students, faculty and staff, including user identification, access control, cost recovery and vending systems.

3.      In 1993, TVI made a decision to contract for a campus identification card system.

4.      On June 4, 1993 TVI issued a request for proposals, numbered P-059 and entitled "ID Card System and Copier Management Program" (the "RFP").

5.      The RFP consisted of two separate procurements known as Lot 1 and Lot 2.  Lot 1 is entitled "Campus Card System" and Lot 2 is entitled to "Copier Management Program".

6.      Lot 1 of the RFP invited vendors to submit proposals for the design, development, implementation, maintenance and support of a computerized system for managing and operating various campus operations and services at TVI through the use of a magnetized card, card swiping components and other computerized data collection and processing equipment and systems ("hereinafter, "Campus Card System").

7.      Among other things the RFP required GMC to:

i.      identify in its proposal "all material and labor costs known to be required to complete the work under" the RFP,

ii.     warrant by its submission of a proposal in response to the RFP that it had "thoroughly inspected the site and work to be done [under the RFP] and that [its] offer includes all costs required to complete the work."

iii.    Paragraph 30 of the second section of RFP No. P-059 specifically required each offeror to define in its proposal its "warranty" which would be provided by the offeror relating to all equipment.  An actual copy of the warranty was to be included in the proposal.

8.      The fifth section of RFP No. P-059, identified as "Introduction", contained background information and provisions specifically fashioned for and relating to the RFP.  It stated the following:

i.      The RFP was intended to solicit specific plans and accurate cost figures for a campus card system and copier management which would incorporate the

campus card upon which TVI could base further actions.

ii.    Under the heading "Copiers", accounting for use of and management of copy machines was identified as the initial primary focus of the RFP.

iii.    Under the heading "Network", TVI's network was described as consisting of four separate Novell local area networks with file server access to a wide area network.

iv.    Under the heading "Cabling", offerors were informed that TVI will "perform any necessary cabling" to insure that all cabling would follow "current standards". Offerors were also informed that TVI used routers to logically segregate the data network into subnet.

9.    The sixth section of RFP No., P-059 identified as "Section F--Lot 1--Campus Card System" contained provisions describing the specific purposes of the RFP as it related to a campus card system. It stated that the first year's priorities were to be implementation of the identification card system and copier management program.

10.    The sixth section of the RFP further stated that, among "future services being considered" were vending machines, bookstore point-of-sales terminals, food service, retail purchases, access control, etc.

11.    GMC responded to Lot 1 of the RFP on June 16, 1993 and ultimately TVI solicited GMC's best and final offer pursuant to the RFP.

12.    In response to Section A of RFP No. P-059, GMC generally described the campus card system, identified twelve references to other educational institutions using the GMC system and offered to lease, sell or lease and sell system components.

13. In response to Section E of RFP No. P-059, GMC proposed that its system would utilize the Novell network of TVI for the central file server, network manager and administrative terminals.

14. GMC also stated that: ". . .your supplying routers will permit us to join your backbone in a seamless, painless operation."

15. In the appendix to its proposal, GMC proposed the following terms and conditions for evaluation of its proposal by TVI:

LIMITED MANUFACTURER'S WARRANTY--NINETY DAYS–
PARTS & LABOR

i.     Applied to all GMC equipment and hardware.

ii.    Free of defects and workmanship and material under normal use for a period ninety days from the date of purchase if recommended installation procedure is followed.

iii.   In no case will warranty exceed original purchase price of equipment.

iv.    If inspection by manufacturer shows defect it will repair or replace at its option; if manufacturer is more than twenty miles away, equipment must be packed and shipped to manufacturer.

v.     Warranty is void if failure or damage is due to neglect, misuse, improper installation, improper power source, fire or lightening.

vi.    EXCLUDES ALL OTHER WARRANTIES, EXPRESS OR IMPLIED; NO REPRESENTATIVE OF GMC IS AUTHORIZED TO EXTEND OR MODIFY THE TERMS OF WARRANTY OR ASSUME ANY OTHER

LIABILITY IN CONJUNCTION WITH THE SALE OF THE SYSTEM OR ITS COMPONENTS; NO WARRANTY OF MERCHANTABILITY; NO CONSEQUENTIAL OR INCIDENTAL DAMAGES OR FOR LOSS OF RECORDS OR FUNDS DUE TO USE OF SYSTEM.

16.     On or about July 1, 1993, TVI notified GMC that it was selected as one of five finalists based on its proposal and that it would be given an opportunity to present and clarify the proposal on July 19, 1993.

17.     On or about July 19, 1993, GMC met with TVI's evaluation committee to present and clarify its proposal.  At that time GMC specifically discussed its warranty with TVI's evaluation committee.  GMC's representative was given a preliminary site inspection tour where copiers and other equipment would likely be placed.  GMC's representative was informed that, pursuant to the RFP, all issues relating to wiring, connectivity and operational condition of TVI's network would be handled exclusively by TVI technical people and would not be a concern of GMC.

18.     In their written evaluations of the proposals for Lot 1, members of TVI's evaluation committee specifically noted that GMC was offering a limited warranty and downrated GMC's proposal on that criterion.

19.     TVI's evaluation committee met on July 21, 1993, to review the presentations that were made.  The committee selected Xerox for Lot 2 of the RFP and GMC for Lot 1 to submit best and final offers.  The evaluation committee's report was that GMC's system was "compatible with TVI's existing computer hardware, network and cabling."  It further stated that, upon positive references, best and final offers would be solicited.

20.     On or about August 6, 1993, in response to TVI's request that GMC submit a "best

and final" offer, representatives of GMC again visited TVI's campus, toured the campus and spoke with TVI administrators and staff. Once again, GMC was told that TVI would be responsible for the wiring and network connections.

21.     On or about August 10, 1993, GMC submitted a "best and final" offer to TVI.

22.     On or about October 6, 1993, TVI awarded Lot 1--campus card system of RFP No. P-059--to GMC and Lot 2 to Xerox Corp.

23.     The Campus Card System as contracted by TVI and GMC pursuant to Purchase Order 300332 as revised, consisted, among other things, of a file server, network managers, computer peripherals and other equipment and components, and the software to run the foregoing. It included the photo ID module and the vending module.

24.     On October 25, 1993 and February 28, 1994, TVI issued its Purchase Orders, numbered 136722, 136723 and 137752 to GMC for the purchase, installation and maintenance of and training on the Campus Card System bookstore module.

25.     The resulting contract between GMC and TVI incorporated the terms of TVI's Request for Proposal No. P-059, Lot 1.

26.     Pursuant to the lease, TVI was required to pay to GMC an annual rental divided into monthly payments of $2,294.68 for the rental of the leased components of the Campus Card System.

27.     The leased property was leased for a five year period.

28.     TVI paid invoiced lease payments for the period November 16, 1993 through September 1996.

29.     The maintenance agreements were agreements for services incidental to and part of the contract for the sale and lease of goods.

30.     Between October 4 and 6, 1993, representatives of TVI and GMC discussed the equipment that was to be acquired by TVI.  GMC was to provide hardware for the photo identification system (including a camera, computer and server), blank identification cards, a file server, network managers, administrative computers, sixty-seven copier readers (copier accountants to be attached to copiers), software, installation, training and maintenance.  GMC was informed at that time that TVI was considering the acquisition of Xerox copiers.

31.     Subsequently, TVI decided to expand the scope of the campus card system by including in it the operation of the campus bookstore.  On October 22, 1996, TVI made a "sole source" determination concerning the purchase of a bookstore module and point-of-sale ("POS") terminals to be used in conjunction with the campus card system.  Attached to the determination were documents sent to TVI by GMC which documents included GMC's limited warranty, exclusions of warranties and limitation on remedies.

32.     On October 25, 1993, TVI issued a purchase order to GMC covering the acquisition of the bookstore module and POS terminals.  The purchase order specifically stated that it was subject to GMC's limited warranty.

33.     Under the contractual arrangement between  TVI and GMC, TVI purchased some equipment, leased the balance and entered into a maintenance agreement for GMC to maintain and repair the equipment.  GMC understood that the lease would be reduced to writing.

34.     GMC drafted a proposed lease showing Thunder Leasing Company, a separate leasing company related to GMC, as the Lessor. TVI objected to signing a lease with Thunder Leasing Company on the ground that Thunder Leasing had not participated in the proposal process.  GMC redrafted the lease showing it as the Lessor and mailed the lease to TVI for execution.  TVI never

returned an executed copy of the lease to GMC. However, TVI has acknowledged the existence of a lease and made lease payments to GMC.

35.     A Maintenance Agreement between TVI and GMC was a part of the original contractual relationship. TVI has not produced an executed copy of the agreement. However, TVI documents confirm the existence of a one-year maintenance agreement with four one-year options in TVI to renew. TVI exercised each of the four one-year options and made payments to GMC under the Maintenance Agreement.

36.     The hardware and software that GMC delivered to TVI consisted of a central file server, three network managers, an administrative computer terminal, photo identification system (consisting of a camera, computer and server), sixty-seven copiers and card readers and POS terminals for the bookstore.

37.     Before installing the hardware and software for TVI, GMC requested information about TVI's computer network in order to determine the compatibility of its equipment with other computer equipment on the network. On November 29, 1993, TVI (Dante D. Hatch, Manager Computer Systems) wrote to GMC and informed GMC that it would receive only limited information about TVI's network because of security concerns. The letter further stated that, due to TVI's policies for computers and peripherals on the network, GMC could only be provided with limited information; that TVI could not provide GMC with the security layout of the network or identification of any of the file servers attached to it; that the information TVI would provide should be sufficient for GMC to configure the new server; and, should further changes in the server arise, the staff at TVI would take the responsibility for implementing them.

38.     TVI denied GMC access to its computer network for security reasons and represented

that it would be responsible for all connectivity, conductivity and compatibility problems. TVI agreed that it would install routers, if necessary.

39.     TVI installed all of the wiring or cabling necessary to connect to the GMC equipment to its existing computer network and directed GMC where to connect it. At no time did GMC study or test TVI's computer network or have any access to it. TVI did not disclose to GMC whether it installed any routers to segregate GMC's equipment from other computer equipment on the network.

40.     On or about November 30, 1993, GMC was notified by TVI that Xerox had delivered sixty-one copier machines which would be connected to the GMC system.

41.     Between November 30 , 1993, and December 7, 1993, GMC delivered the computer hardware to TVI including copier card readers. GMC scheduled the installation and training for TVI for the week of December 6 through December 10, 1993.

42.     TVI informed GMC that it did not want the copier card readers installed because of a protest of the award of Lot 2 to Xerox Corporation. The protesting party was Business Machines Center. In December 1993, Business Machines Center had sued TVI to invalidate the copier award to Xerox. TVI informed GMC that the GMC copier card readers would not be installed or used during the pendency of the litigation.

43.     On March 3 and 4, 1994, GMC installed at TVI the POS terminals, a file server, digitized photo identification system, at least one network manager and possibly one copier card reader.

44.     After GMC installed its system at TVI, TVI added additional computer equipment to its computer network without GMC's knowledge and that additional equipment greatly increased the message traffic on the network.

45.     TVI never requested that GMC install the copier card readers purchased in 1993.

46.     Sometime in 1996, TVI contacted GMC to inquire whether the copier card readers could be modified and used for another purpose such as access control.  GMC responded that they could but TVI never did anything further to process a modification.

47.     TVI has never used the majority of the GMC copier card readers.

48.     TVI's decision not to use the GMC copier card readers was a voluntary decision on its part unrelated to the quality or operational capability of the equipment.  There is no evidence that the copier card readers would not have worked properly had they been used by TVI.

49.     The GMC bookstore equipment, including POS terminals were installed by GMC in March 1994 and were used by TVI to process bookstore transactions until late 1995.

50.     In late 1995, TVI decided to outsource its bookstore operation to a third-party independent contractor by the name of Follett College Stores.

51.     Follett had its own computer equipment for operation of the TVI bookstore.  Before TVI contracted with Follett, it knew that Follett's computer equipment was incompatible with the POS terminals that TVI had acquired from GMC.

52.     TVI's decision to outsource the operation of its bookstore to Follett College Stores was a voluntary decision on TVI's part which had nothing to do with the quality or operational capability of the equipment.  Before outsourcing the bookstore operation to Follett, TVI used the bookstore module and POS terminals.

53.     After TVI outsourced the copier management and bookstore operation, it continued to use the remainder of the system and was still using it as of December 1998.  Data downloaded from the GMC equipment in 1998 shows that, in 1998, the GMC equipment that was still being used

was processing transactions and that, from 1993 to 1998, the GMC system had processed thousands of transactions involving millions of dollars.

54.     In 1995, TVI issued a request for proposals identified as RFP No. T-080 for "food and beverage vending machine services." The RFP specifically required offerors to supply equipment that would be compatible with the GMC system.

55.     At all times during the term of the contract between TVI and GMC, TVI had in place a system for documenting failures of equipment. Under this system, every time that a piece of equipment failed, a document called a "work order" or "trouble ticket" was supposed to be prepared. The work orders or trouble tickets were to identify the equipment involved, the problem and the date of the problem. TVI does not have a single trouble ticket involving GMC's equipment.

56.     At no time prior to October 6, 1993, did TVI ever inform GMC that it was not accepting GMC's limited warranty or that it did not agree to that warranty or that the limited warranty was not a part of the contractual relationship between TVI and GMC.

57.     TVI has never given GMC notice of any warranty claim under GMC's limited warranty.

58.     In April 1996, when TVI was not using the GMC copier card readers and the bookstore equipment, TVI asked GMC to let it out of the lease agreement. GMC declined. On September 6, 1996, an official of TVI prepared a memorandum in which he noted that GMC would not voluntarily cancel the lease and his superior's recommendation that TVI document problems with the GMC equipment in order to "work toward getting out of the Lease".

59.     No specific problems with GMC's equipment were documented by TVI between September 5 and October 24, 1996.

60.     On October 24, 1996, the same TVI official authored another memorandum in which he concluded that TVI had encountered a problem with GMC's network managers being very sensitive to traffic on TVI's local area network. He concluded that the only way to keep this from happening on a regular basis was to isolate the GMC components from TVI's network by using a router system. Although GMC made suggestions to TVI regarding router placement, TVI never installed routers to solve the perceived problem.

61.     TVI represented to GMC in 1993 that it used routers to segregate its computer network into logical subnets. GMC represented that its equipment would operate on TVI's network if TVI supplied routers. Any problem with the operation of GMC equipment on TVI's computer network in 1996 was caused by message traffic on the network and not by any defect in GMC's equipment. That problem could have been solved by the installation of a router or routers by TVI and TVI declined to do that.

62.     In order to properly place routers, one would ha ve to have detailed knowledge of a particular network. GMC did not have anything but a broad knowledge of the TVI network configuration and could not be expected to guarantee their system would operate on TVI's network. TVI is a sophisticated computer user and consumer and had superior knowledge of its network.

63.     At the time this lawsuit was filed, the copier card readers and bookstore components of GMC's system were offline as a result of voluntary decisions on the part of TVI not to use them or to outsource the activity involved. With regard to the remainder of the GMC system, on May 28, and December 19, 1998, GMC representatives went to the TVI facility and downloaded information from the GMC file server. The information that was downloaded showed that, on both occasions, the remainder of the GMC system was still operating and was continuing to process transactions.

64.     There is no evidence that GMC's equipment was defective or that it would not have operated without problems if TVI had installed a router or routers to segregate the GMC equipment from other computer equipment on TVI's computer network.

65.     The GMC equipment (hardware and software) was tested as a stand alone system in 1996 and operated well at 90-95% utlization.  The system normally operates at 10-15% utilization.

66.     TVI, during the course of the contractual relationship with GMC, made 33 months of lease payments to GMC.  At no time during this 33 month period did TVI threaten to stop payments.   In fact, during this period, TVI purchased upgrades from GMC, continued the maintenance agreement, issued additional purchase orders for GMC goods and services and made sole source determinations in favor of GMC.  All of these actions were inconsistent with the TVI contention that they rejected non-conforming goods.

67.     TVI did not give GMC ample and timely notice that the basic components of the Campus Card System included in the initial partial installation were not functioning properly.

68.     GMC provided sufficient assistance by telephone to assure TVI that the series of problems would be resolved and that the system would eventually be operable.

69.     On October 21, 1996, GMC's director of technical support informed David May, TVI's Campus Card System administrator, that its network managers could not run on TVI's Ethernet network because the network managers required more through-put than TVI's Ethernet network could provide.  A member of GMC's technical support staff subsequently advised Mr. May that the network managers might run on the network if the Campus Card System was isolated from TVI's Ethernet network by installing routers.

70.     The total amount that TVI was to pay to GMC under its contractual relationship was

$290,790.00. As of the date of filing this suit, TVI had paid $224, 245.00, leaving a balance of $65,545.00 owed to GMC which TVI has declined to pay.

71.     GMC is a merchant and merchant lessee of the goods and services at issue in the Contract.

## CONCLUSIONS OF LAW

1.     The Court has jurisdiction over the parties and subject matter of this action.

2.     TVI and GMC entered into a contract for the sale and purchase of various hardware and software components of a modular system collectively known as the Campus Card System. The modules were the photo ID, vending, bookstore point of sale and parking lot access modules. As part of the contract, TVI agreed to lease various other items of hardware that were part of the Campus Card System.

3.     The response by GMC to the TVI RFP was the offer to contract and the issuance of purchase orders by TVI was the mechanism of acceptance that constituted the contract.

4.     GMC agreed to provide the services of maintaining and supporting the hardware and software that TVI purchased and leased from GMC.

5.     The contractual relationship between TVI and GMC is governed by the sales and lease articles of the Uniform Commercial Code.

6.     GMC provided TVI with a limited warranty that excluded all other express and implied warranties and limited the liability of GMC. TVI was bound by GMC's limited warranty. TVI never gave GMC a notice of a warranty claim under the limited warranty. There were no other express or implied warranties from GMC.

7.     TVI did not give any notice to GMC within a reasonable time of delivery of any non-

conformity of the GMC system to the contract requirements, or any seasonable rejection by it of the system or of a seasonable revocation of an acceptance.

8.    Although TVI acquired copier card readers and maintenance thereon from GMC, it voluntarily elected not to use those copier card readers as a result of (a) an unrelated lawsuit and (b) a decision to purchase copiers that did not require the copier card readers.  There was no breach of contract, breach of warranty or tortuous conduct by GMC with respect to the copier management hardware, software and maintenance.

9.    TVI acquired a bookstore module and POS terminals from GMC for the operation of its bookstore.  This equipment operated, and was used by TVI, until late 1995, when TVI decided to outsource its bookstore operation to Follett College Stores.  TVI knew that Follett had its own computer equipment.  That decision was voluntary on TVI's part and resulted in the GMC bookstore point of sale equipment to be abandoned.  There was no breach of contract, breach of warranty or tortuous conduct by GMC with respect to the bookstore module and POS terminals.

10.    GMC did not breach any warranty applicable to the contractual relationship with TVI.

11.    GMC did not violate the provisions of the New Mexico Unfair Practices Act.  Sections 57-12-1, et seq. N.M.S.A. (1995 Repl. Pam.)

12.    GMC did not commit any intentional fraud.  *Eoff v. Forrest,* 109 N.M. 695 (1990).

13.    GMC did not make any negligent misrepresentations.  *Stotler v. Hester,* 92 N.M. 26 (Ct. App. 1978) cert.denied. 92 N.M. 180 (1978).

14.    The cause of any perceived problems with the GMC equipment was message traffic on TVI's computer network and that problem could have been solved with the installation by TVI of routers.

15.     GMC did not breach its contract with TVI and TVI is not entitled to recover any damages.

16.     TVI contracted with GMC to pay GMC $290,790.00 of which $224,245.00 has been paid to date.  The parties stipulated that if GMC recovered under this action that GMC was owed $60,809.02.

17.     TVI breached its contract with GMC and GMC is entitled to recover $60,809.02 in damages.

_____
RICHARD L. PUGLISI
United States Magistrate Judge
Sitting by designation